## WOOD *v.* STATE.

(In Banc. Nov. 21, 1932.)

[144 So. 545. No. 29876.]

Hunter Garth, of Hazlehurst, Reily & Parker, of Meridian, and R. T. Hilton, of Jackson, for appellant.

M. S. McNeil, of Hazlehurst, for the State.

**W. D. Conn, Jr.,** Assistant Attorney-General, for the State.

**Ethridge, J.,** delivered the opinion of the court.

At the November, 1931, term of the circuit court of Copiah county, the appellant, Dr. J. H. Wood, was indicted for the murder of one W. D. Fleming, put to trial at the same term of court, convicted of manslaughter, and sentenced to serve a term of fifteen years in the penitentiary, from which conviction he appeals here.

The killing occurred on June 9, 1931, on the streets of Georgetown, Copiah county, Mississippi, in daylight.

There is a great deal of conflict as to how the difficulty occurred, and certain physical facts in evidence have a very material bearing upon the transaction.

Mr. Fleming, the deceased, had driven from his home at Rockport, Mississippi, near Georgetown, in a car, accompanied by another who had disembarked from the car a short time before the killing, and after the car had reached Georgetown.

It was shown by a witness first introduced by the state, and who resided at Fleming's home, that he constantly carried a pistol in his car. On arriving at Georgetown, Mr. Fleming parked his car facing a slight angle northeast in the street running north and south in front of the bank, and Dr. Wood was a little distance north of the bank in the street in front of the post office talking to a Mrs. Powell and her daughter.

When Fleming stopped his car, Dr. Wood remarked to Mrs. Powell that there was a man he wanted to see, and proceeded to where Fleming was, and, according to the testimony of these ladies, walked up to Fleming's car. placed his foot on the running board, and his left hand on the top part of the car, saying something which they did not hear, and soon a struggle began. These ladies also testified that in the struggle Fleming's pistol was

discharged, that the struggle continued, and thereafter other shots were fired.

The witness for the state who had come to Georgetown with Mr. Fleming testified that he had disembarked from the car in front of Mrs. Berry's store in Georgetown, and was looking in the direction of the bank when Mr. Fleming stopped his car, and that he saw Dr. Wood talking to the ladies, leave the car where the ladies were, approach to where Mr. Fleming was, pass in front of Mr. Fleming's car to the left side thereof, and say something which he did not hear, and that the next thing he saw was a pistol scabbard flying from Dr. Wood, falling into the street, and that Dr. Wood began beating Mr. Fleming over the head with the pistol and Mr. Fleming was trying to ward off the blows; that Dr. Wood fired his pistol and Mr. Fleming reached into the pocket of his car and got his pistol, and that they were struggling over the pistol for a few moments; that Mr. Fleming fired and Dr. Wood fell, his head facing south; that, when Dr. Wood fell, Mr. Fleming stepped over the lower part of his body picked up Dr. Wood's pistol, and threw it farther into the street away from Dr. Wood, stood over him a few minutes looking at him, and then turned and went into the drug store.

Another witness, Carey Channell, testified that he saw the beginning of the difficulty, and his statement coincided largely with that of the witness Catch Johnson, above mentioned, but he says that after the shooting Mr. Fleming stepped across the body of Dr. Wood, picked up his pistol, and some one standing near said, "Give me that pistol;" and that Mr. Fleming said, "He attacked me first." This witness also testified that Dr. Wood arose in a few moments and went to the sidewalk. that some one asked him something in reference to it, and that Dr. Wood said. "He called me a son of bitch and I asked him to take it back, and he shot me."

Mrs. Powell's daughter testified to the same effect as her mother, as above mentioned.

There were a number of witnesses who did not see the beginning of the difficulty but were attracted by the first shot, and these testified to the effect that, when that shot was fired, they looked and saw the parties scuffling, and that Dr. Wood was backing to the south and Mr. Fleming was advancing, and that they were apparently trying to knock each other's pistol away.

There were a number of witnesses for the state who testified that the first shot was the loudest, and that only two shots were fired.

Other witnesses testified that there was one shot fired, and then a scuffle, and then two other shots were almost simultaneously fired, and that it was difficult to distinguish the interval between the shots last fired.

After Dr. Wood was shot and fell, and Mr. Fleming stepped over him and threw Dr. Wood's pistol out of his reach, stepped back to the body and stood looking at it intently, he said, according to some witnesses, "I ought to kill you but I will let you live," and then turned and walked in the direction of the drug store and entered the office of Dr. Williamson, stating, "Boys, he has got me." Dr. Williamson attempted to place Fleming on a table to examine him, but could not, as he seemed to be strangling, and he expired in a few minutes.

Will Lee, an officer of the town, walked into the room where Fleming was shortly after he had entered it; and Fleming stated to Lee that he (Fleming) was going to die; Lee stated that he hoped it would not be that bad, but that, if Fleming thought he was going to die, a statement should be obtained, and Lee then went off to get writing materials, returning shortly, and Fleming stated that Dr. Wood attacked him first, but was unable to make any further statement as he died in a few minutes. The pistols were turned over to Lee, who examined them, and later turned them over to the deputy sheriff.

The testimony showed that Fleming's pistol had been discharged twice, and that it was a .32 caliber, according to one witness; and in the sheriff's testimony it ap-

pears that the cartridges in his possession were .38 caliber, and that Dr. Wood's pistol was a larger pistol than Fleming's its caliber not being shown. Fleming's, wound began at his wrist, and went along his arm and into his chest, but did not emerge from the body. The larger number of witnesses who testified as to the sound of the shots said that the first shot was fired from a large caliber pistol, as it made the loudest sound. A number of witnesses said that only two shots were fired, and some of these would not be positive that there were not two shots fired simultaneously after the first shot was fired. One witness for the defendant testified that he was in the bank when the first shot was fired, and that the bullet came into the bank, passing through the screen window, striking the wall of the bank at an angle, and dropping onto the floor. This bullet was testified to as being from the smaller gun. Fleming's pistol had in it, at the time, different kinds of bullets, some being lead, and some being steel jackets, and the steel jacket ones had a ring around the cartridges.

Dr. Wood testified that when Fleming drove up he was talking to Mrs. Powell and her daughter, and that he said there was a man he wanted to see, and walked down to where Fleming was parking his car in front of the bank; that he passed in front of the car, to the left side thereof, placing his hand on the top of the car and his foot on the fender, and spoke to Fleming, stating, "Would like to have a talk with you this morning," and that Fleming looked up at him and said, "I had rather kill you, you son of a bitch," and drew his pistol; and that he (Dr. Wood) grabbed Fleming's arm, trying to keep him from firing the pistol, and that they were struggling over it when it was discharged, and continued to struggle for some seconds; that he (Dr Wood) had been sick for some time and was weak, and seeing that he could not hold Fleming off and take his weapon from him, upon being freed in the struggle, pulled out his own pistol and fired, then fell, and did not remember hearing either of the

last shots fired. He stated that the reason he was armed was that he had received information from two different persons to the effect that he had better go armed; that a mob was being organized, and his life was in danger. He named the persons who communicated these reports to him, stating that this threat did not come from Fleming. Dr. Wood testified that he did not have a scabbard, but carried his pistol inside his pants. He also testifie that he desired to talk to Fleming about the matter of this alleged mob or threat which came from the community in which Fleming lived. Dr. Wood offered to testify that he and Fleming had adjusted a former difficulty which had existed, and had made friends, and that, for this reason, he desired to talk to Fleming, and approached him on the occasion mentioned on a peaceful mission.

Prior to Dr. Wood's taking the stand, the state had introduced a witness, and tried to prove by him a former difficulty between Fleming and Wood, and to show that Dr. Wood's attitude at that time was unfriendly to Fleming. The court sustained objections to this evidence, but there were a number of questions asked indicating prior difficulty, and there was some evidence to show that there had been a misunderstanding between Wood and Fleming.

When Mrs. Powell was being examined as a witness, before the examination of Dr. Wood, she was pressed to answer questions as to her knowledge of a prior difficulty between Wood and Mr. Fleming, and she stated that her husband had informed her as to some kind of trouble between them.

When the witness Catch Johnson was on the stand the defendant sought to show that he was an unfriendly witness, and he admitted that he was not friendly to Dr. Wood. He was then asked concerning an exclamation he was alleged to have made at the time Dr. Wood fell that, "It was a damned good shot, boy, he's got what

he's been wanting for a long time." On objection by the state, the court refused to admit this testimony.

On examination, one of the witnesses for the state, Carey Channel, above mentioned, was asked by the defendant, on cross-examination, as follows:

"Q. I will ask you this question if Dr. Woods wasn't a witness against your brother charged with murder, if you haven't got hatred, illwill and prejudice against him? (Objection sustained by the court.) A. No, I ain't no such man to pick up no such stuff against a white man. (By the court, objection sustained.)"

The defendant requested the following instructions, which were refused by the court:

1. "The court charges the jury for the defendant that even though you might believe from the evidence that previous to the fatal shot the defendant had malice toward the deceased, and had designed to kill him, and had armed himself with a pistol for the purpose of killing him and was expecting a meeting with the deceased, yet if they believe that when the defendant approached the deceased he did so in a friendly manner and without making any overt act or provoking the difficulty with the deceased, and it became necessary for the defendant to shoot the deceased, because it was apparent to the defendant that he was in danger of losing his life, or suffering great bodily harm at the hands of the deceased and he shot the deceased because of such apparent danger, and not in pursuance of his original intention to kill the deceased, you should find the defendant not guilty. Refused."

2. "The court charges the jury for the defendant, that, if the defendant had been informed and believed that his life had been threatened, or that he was threatened with great bodily harm, that he had a lawful right to carry a concealed deadly weapon. And the court charges the jury further that while so armed, he had a lawful right to approach the deceased, Fleming, on any peaceable mission or purpose and to use the said deadly

weapon in defense of his life, or himself from great bodily harm from an attack made upon him by Fleming. Refused.''

These two instructions, together with the objections to the testimony above indicated, constitute the principal errors relied upon for reversal.

We think the court should have admitted the exclamation of Catch Johnson at the time the shot was fired that it was a good shot, and Dr. Wood had gotten what was coming to him for a long time, if such statements were actually made, as they show motive to the extent of bias, prejudice, and hostility of this witness to the defendant, Dr. Wood. It is true the witness admitted that his feeling was not good toward Dr. Wood, but we think this expression would have been proper to go before the jury, as it indicated very clearly that the witness was an extremely hostile and biased witness.

We also think that the court should have admitted evidence by Dr. Wood that he had settled and adjusted a prior difficulty with Fleming, and that he had approached him on a peaceful mission with no intention of provoking a difficulty or taking his life.

The state had attempted, in many questions, as shown by the record, to show that there was a prior difficulty. It is true that the court sustained objections to most of these questions, but enough of the testimony was admitted to show a prior difficulty, and we think this was important to show that the difficulty, if it was a fact, had been settled. It would have had a material influence upon any reasonable man. This is especially true when the record shows that Dr. Wood was a man 61 years of age, who had been seriously ill only recently for a good many months. This alone might not be sufficient to reverse the judgment, but it was a matter of vital importance for the jury to understand that Dr. Wood had a right to be armed because of threats made against him, and that he had a right, being so armed, to approach

Fleming in a peaceable manner, and the refused instruction No. 2 should have been granted to carry this information to the jury.

It is urged that the given instruction No. 5, reading as follows: "The court instructs the jury for the defendant, that if you believe from the evidence, or if a reasonable doubt arises from the evidence in this case that the defendant was armed with a deadly weapon on the morning of the shooting, and on the streets of the town of Georgetown, and talking with Mrs. Powell, and that the deceased drove up in his car, and defendant left the car of Mrs. Powell and went to the car of the deceased on a peaceable mission, and that immediately after the defendant arrived at the car of the deceased, or thereabout, the defendant spoke to the deceased on a peaceable mission, and that the deceased threw down what he had in his hand and grabbed his pistol and began to curse the defendant and threatened to kill him, and began to make an effort to shoot the defendant, and the defendant caught the deceased by the arm or hand that contained the pistol, and they began to scuffle, and while doing so the deceased's pistol discharged and they continued to scuffle, and finally the deceased threw the defendant aloose, or away from him, and the defendant knocked the deceased's pistol away from him, and then and there got out his pistol and that the deceased and defendant fired their pistols almost at the same time, and the defendant killed the deceased, then it is your sworn duty to find the defendant not guilty. Given"—cured this error, but we do not think that it did. This instruction summed up the entire testimony of Dr. Wood, and told the jury that, if they believed the statements embraced therein, they should find the defendant not guilty. The jury were not told, separately from the other hypotheses, that Dr. Wood had a right to be armed with a deadly weapon and to approach the deceased on a peaceable mission. The instruction, as given, embodied too many hypotheses,

each of which depended upon all the others, and it could not be held to justify a refusal of instruction No. 2.

The evidence, so far as the physical facts were developed, tended to sustain Dr. Wood's version of it, and it must have been that the jury were impressed by the fact of a former difficulty, and that Dr. Wood sought the deceased, being armed, thus cutting off himself from the right to defend himself from danger which resulted therefrom.

There is no dispute that the first bullet went into the bank and was found there. There is conflict between the state's and the defendant's witnesses as to whether Wood or Fleming fired the first shot. It is undisputed that Wood only fired one shot and that entered Fleming's body and stayed there; consequently it could not have been Wood's bullet that entered the bank. The testimony shows that, when Wood was shot, he was facing north, and Fleming was facing south. The bullet from Fleming's gun went into Wood's ear, made a trench in the bone in the rear of the ear, and emerged, going in a southerly direction; consequently it must be that the bullet that went into the bank was fired from Fleming's pistol. His pistol had been discharged twice, and, as the last bullet was fired in a southerly direction, and, as the proof shows, the first shot entered the bank, it becomes almost demonstrable that the first shot was fired by Fleming, and that bullet entered the bank.

In the light of these physical facts, it was highly important to show the state of mind of witnesses who testified against Dr. Wood, if they were, in fact, as hostile as the evidence would indicate.

We think, for the reasons indicated, that the judgment must be reversed, and a new trial granted.

Reversed and remanded.

**Smith, C. J.**, and **Anderson, J.**, dissent.