300 So.2d 797 (1974)
Evelyn DEAN
v.
STATE of Mississippi.
No. 47987.
Supreme Court of Mississippi.
September 16, 1974.
Rehearing Denied October 14, 1974.
*798 Perry, Taylor & Whitwell, Robert G. Gilder, Southaven, for appellant.
A.F. Summer, Atty. Gen., by William D. Boerner, Sp. Asst. Atty. Gen., Jackson, for appellee.
SMITH, Justice:
Evelyn Dean was convicted in the Circuit Court of DeSoto County of the murder of one Bobby Gene Hughes. From her conviction and sentence to life imprisonment she appeals.
It appears from the record that the appellant is a mature woman, with five previous marriages, who was living with Hughes at the time of the homicide. She and Hughes were not married and, according to the appellant's testimony, the fatal quarrel arose out of her insistence that he marry her.
The substance of appellant's version of the circumstances which culminated in the homicide was that, to say the least of it, her life with Hughes had been tempestuous. She said that Hughes had a high temper and often struck and abused her. On the afternoon of the homicide she had returned to their trailer home at about 12:30 or 12:45. She found Hughes on the couch or sofa and she again broached the subject of marriage. Hughes rudely and unequivocally rejected the idea. One word led to another and Hughes "slung" her against a table and she fell on the floor. He accompanied that action, she says, by threatening to kill her, although he made no move to do so. She got up from the floor and went into a small bar where she picked up a .38 caliber Smith & Wesson revolver. She testified that she did this because she was afraid of Hughes. As she started toward the bedroom, carrying the pistol in her right hand, Hughes, with an oath, asked her where she was going. She said that she told him she was going to her parents. She then went toward the sofa where Hughes was sitting "in a relaxed position" and sat down opposite him on a coffee table, still holding the pistol in her right hand. Hughes said, according to appellant, "You are not going anywhere" and reached back toward a credenza on which there was a brass ash tray and a vase. She said that she believed he was reaching for one or the other of these objects, she didn't know which, with which to hit her as she continued to sit on the table. As he reached, according to appellant, Hughes said, "I'll beat the God damned hell out of you if you even start out of here." Appellant testified, "I don't remember doing it, but the gun went off" then, and Hughes slumped toward her. She says that she does not remember pulling the trigger, Afterward, appellant says, she pushed *799 Hughes back onto the sofa and put his leg, which had been on the floor, back on the sofa.
Appellant called her brother and asked him to call the sheriff, which he did. Responding to the call, the sheriff of DeSoto County arrived at the trailer. There, he testified, appellant met him at the door. He asked what had happened and appellant said "I shot him." The sheriff found Hughes lying on his back on the sofa dead, with two gunshot wounds, one just below his left ear, the other just below that, in the left side of the neck. Blood had accumulated below the wounds as Hughes lay on his back on the sofa and the sheriff said there was no blood at any other place. Photographs of the scene, showing the position of the deceased and his wounds were introduced without objection. This evidence was offered as tending to establish that deceased had been shot twice, with the shots closely spaced in the left side of the head and neck, as he lay on his back on the sofa. Also, it had the effect of tending to refute appellant's claim that Hughes had been sitting in the middle of the sofa, and that when the gun had "gone off" both of them had been moving.
It is evident, therefore, from appellant's own testimony, that immediately prior to the fatal shooting she and the deceased were engaged in a serious quarrel and that this continued to the time of the shooting. She testified that Hughes was continuing to threaten her life as she sat before him on the coffee table, holding the revolver in her right hand. There was evidence, which the jury could believe, that appellant had stated previously that she loved Hughes and that "If I can't have him nobody else would." Also, the sheriff testified that appellant had told him at the jail that she had taken the revolver out previously and had practiced fired it in order to be certain that it would shoot as she was afraid of Hughes.
Appellant assigns as reversible error five "points." However, only two are argued or briefed.
It is contended that the sheriff of DeSoto County, the officer who investigated the homicide and who arrested appellant, should not have been allowed to testify as to statements made to him by her.
A motion was filed on behalf of appellant asking the trial court to suppress "confessions and/or admissions" made by her to "any law enforcement officer" of DeSoto County "at any time" prior to indictment "or at any other time prior thereto or thereafter without being fully advised of her constitutional rights." Assigned as grounds for this motion were (1) she had not been "fully advised of her constitutional rights" by any officer or law enforcement official and (2) she had not been "properly represented by counsel" and was "improperly questioned without being advised of her constitutional rights" and was without "voluntary" counsel or "any other counsel" until subsequent to her arrest.
A preliminary hearing on this motion was requested and granted.
At this hearing, appellant neither testified nor offered any proof whatever. The DeSoto County Sheriff, who was the only officer concerned in the investigation and arrest and to whom such statements as were made had been addressed by appellant, testified as a witness for the State. He said that he had been called to the trailer home of the deceased by her brother who informed him of the shooting. When he arrived there appellant came to the door and, when asked what had happened, said "I shot him." The sheriff asked whether the man was dead or not and was told by appellant that she did not know. He observed the victim lying dead upon the couch. He saw two bullet wounds, one immediately below the left ear, the other a little below that, in the left side of the neck. The sheriff asked for the gun which appellant handed to him. This proved to be a .38 caliber Smith & Wesson revolver. At this point the sheriff first gave the appellant the "Miranda" warnings. A short time later, when appellant *800 began talking to the sheriff, he repeated the warnings previously given.
After appellant was placed in jail, the sheriff obtained a doctor for her who visited her in her cell. The sheriff testified that the doctor's visit took place about 3:00 in the afternoon and that some kind of medication was given appellant by the doctor, but that the sheriff did not know what it was or whether it had been given by mouth or by injection. At about 5:00 in the afternoon appellant sent for the sheriff and he went to her cell. There is nothing in the record to indicate that at this (or at any other) time appellant was not in full possession of her faculties. Appellant spontaneously told the sheriff, without any interrogation, that she had, on a former occasion, taken out the gun with which she had killed Hughes, and had fired it, to see "if it would shoot" because she was afraid of Hughes. She told the sheriff that if he would look in her car he would find the empty shells between the seats. However, no search was ever made.
Appellant did not testify or offer any proof on the motion to suppress. She did deny, when testifying as a witness in her own behalf, that she received the Miranda warnings as testified by the sheriff. She never suggested that she had been under the influence of medication or drugs at the time she had talked to the sheriff at the jail, although interrogated on cross-examination about what she had told him there. She denied having made the statement attributed to her as to test firing the gun. It will have been seen that the motion to suppress made no allegation that appellant had been in a drugged condition from medication or otherwise that might have impaired her understanding or will at the time she had sent for the sheriff and told him of test firing the gun. Moreover, no specific objection was made upon such a ground to the sheriff's testimony that the statements had been voluntarily made to him at the jail.
The only other point argued as to the motion to suppress is that the "Miranda warnings" twice given by the sheriff at the time of his investigation (which must have been later than 12:45 when appellant said she had returned to the trailer), were ineffective insofar as statements made by appellant at 5:00 in the afternoon were concerned, and is without merit. Especially is this true in a case such as this where it is perfectly clear from the record that there was never any "interrogation" of the appellant.
The "medication" contention was formally raised as one of the grounds assigned in a motion for a new trial. Since the motion to suppress did not specify this as a ground, and as the suggestion only appears in questions addressed to the sheriff on cross-examination, this was the first time the proposition was formally presented. It was alleged in the motion for a new trial that:
(4) The Court erred in overruling the objection by Defendant to the testimony of Sheriff Lee Meredith about statements allegedly made by Defendant to Sheriff Meredith at the DeSoto County Jail within approximately two hours after Defendant had received sedation from a Doctor.
No proof of any kind to support this charge was offered or produced upon the hearing of the motion for a new trial.
Allegations of fact in a motion for a new trial are at issue without further pleadings, just as they are in any other type of motion. As with the motion to suppress, neither the appellant nor her doctor was offered to support the motion and there was no tender by appellant of a waiver of privilege with respect to the doctor's testimony. There is nothing in the record to support the view that appellant's statements made to the sheriff after she had called him to the jail were made at a time when she was under the influence of some drug or medication which destroyed her free will or understanding. The only evidence touching statements made by appellant *801 to the sheriff is from the sheriff himself. He testified unequivocally that the statements were freely and voluntarily made by appellant after she had twice received from him the warnings required by Miranda.
The position of appellant with reference to the "medication" rests entirely upon conjecture, with no showing that she had been affected by it, whatever it may have been.
It would be ironical indeed if the case should be reversed upon such an unwarranted surmise and on remand it should develop that the "medication" had been, in fact, a couple of aspirin tablets.
[A] motion is at issue without further pleading and that the allegations thereof do not amount to any proof of the facts stated therein. It is the duty of the movant to support his motion by proof and in the absence of proof in support of the motion, the presumption in favor of the correctness of the action of the trial court will prevail. (Brown v. State, 252 So.2d 885, 887 (Miss. 1971).
Under the circumstances, a prima facie case of voluntariness was made out by the sheriff's testimony and it then became incumbent upon appellant to go forward with countervailing proof, if there was any.
The trial court correctly (1) overruled the motion to suppress and (2) denied the motion for a new trial.
The only other question argued and briefed relates to the refusal of the trial court to grant one of the four requested instructions dealing with appellant's right of self-defense. The other three were granted and adequately informed the jury as to the applicable law. The refused instruction, the denial of which is complained of, is a virtual copy of a part of an instruction, the giving of which this Court held to be justified under the peculiar facts of Wood v. State, 165 Miss. 363, 144 So. 545 (1932). Of the Wood case, this Court later said that: "The decision in Wood should be limited to the particular circumstances of that case, where the instruction joined the right to carry the weapon with the right to approach deceased on a peaceful mission."
It should be noted that, in Wood, this Court stated that the evidence that Wood fired only in self-defense made that fact practically "demonstrable." The evidence narrated by the Court in its opinion in Wood showed, as a matter of fact, that it had been demonstrated that Wood did not fire until after he had been fired upon. In Wood, the prior quarrel between Wood and the deceased was separated from the occasion of the shooting by a very considerable lapse of time. In the present case, according to appellant's own testimony, the quarrel in which she and Hughes were engaged was in progress, and had not ended. She was, she says, being threatened by deceased. Appellant's own version is that following a violent physical attack, in the face of deadly threats and in the course of an unfinished quarrel, she went into the bar, armed herself with a pistol, which she held in her right hand as she responded to Hughes rude order to "come here," and that she had shot him twice when she believed that he was reaching for some object with which to hit her.
The portion of the Wood instruction which comprises the whole instruction tendered by the appellant in this case, and which the trial court refused to grant, improperly assumed as established facts as to which there was an issue to be determined by the jury under the circumstances of this case.
The weapon used by the appellant to kill Hughes was a revolver, a well-known type of firearm, which requires the exertion of definite force to pull the trigger, unless it has been "cocked" in advance, and there is no suggestion of this having been done. Appellant testified that she "didn't remember doing it but the gun went off," she does not know how. The evidence is that *802 the deceased was shot twice, the wounds having been closely placed, one below the left ear and one in the left side of the neck. The sheriff's testimony as to the location of the pools of blood tends to show that the shots took effect as the deceased lay on his back on the sofa, and not, as appellant testified, as he sat in the center of the sofa in a "relaxed" position or as he was reaching behind him with one hand and reaching for her with the other. The resolution of these questions lay peculiarly within the province of the jury.
The evidence was sufficient to support the conviction and there having been no prejudicial error committed in the trial, the conviction and sentence appealed from must be affirmed.
Affirmed.
RODGERS, P.J., and ROBERTSON, WALKER and BROOM, JJ., concur.