324 So.2d 245 (1975)
Hershel Ray AUSTIN
v.
STATE of Mississippi.
No. 48824.
Supreme Court of Mississippi.
December 22, 1975.
Harry L. Kelley, Jackson, for appellant.
A.F. Summer, Atty. Gen. by Pete J. Cajoleas, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before RODGERS, INZER and SMITH, JJ.
*246 RODGERS, Presiding Justice.
The appellant, Hershel Ray Austin, was indicted by the Grand Jury of Alcorn County, Mississippi, for the crime of murder. He was tried, convicted and sentenced to a life term in the state penitentiary. He has appealed to this Court and complains that he did not get a fair trial in the Circuit Court of Alcorn County for the following reasons:
(1) The trial court erroneously permitted a medical doctor to give his opinion as to the position of the deceased's arm and body at the time of the fatal shot.
(2) The court erroneously refused defendant an instruction on the right to carry a concealed weapon.
(3) The court should have granted a directed verdict in favor of defendant.
(4) The verdict of the jury was against the overwhelming weight of the testimony.
The defendant and Elsia Streetman had been "dating" for several months prior to January, 1974. They were going together "steady" since she was divorced from her husband. On the afternoon of January 27, 1974, the defendant and Elisa Streetman, in company with Mr. and Mrs. Jackie Nix, had been riding in defendant's automobile. They stopped at a cafe to eat. Elisa Streetman called her father and requested that he come after her. On the way to his home, she told her father that she had decided not to marry defendant; that he carried a pistol and would likely come after her. Elisa was not living with her father, Charlie Ed Benjamin. She was living with her mother, Mrs. Bertha Benjamin in Wheeler Grove Community in another part of Corinth. Her mother and father were separated. Her father was living with his brother Claude Allen Benjamin, part-time in a trailer and part-time in the home of Claude Allen Benjamin.
When Elisa, her brother Tony and father reached the home of Claude Allen Benjamin, her father called the sheriff of the county on the telephone. In the meantime, the defendant  having discovered that his "date" Elisa had left the cafe  drove to the home of her father. He parked behind a truck near the trailer home of Charlie Ed Benjamin. In the meantime, Charlie Ed Benjamin had alerted his 24-year-old nephew, Anthony Wayne Benjamin, to secure a 30/30 rifle, and the two men went out into the front of the carport before the defendant drove his car into the driveway. When the defendant got out of his automobile, Anthony Wayne Benjamin commanded the defendant to "go away you are not welcome." Elisa's father said, "Go on and forget it. It is over with." Then he told his nephew, "Let me talk to him." Austin, the defendant, said: "I want to talk to Lisa. I want to get this settled." Elisa's father then turned to his nephew and said: "Let him come up here and talk, if she wants to talk to him." Elisa said that she did want to talk to him. The defendant asked her, "What was the matter, why was she doing that." While the defendant was engaged in conversation with Elisa and her father, her uncle, Claude Allen Benjamin, came out of his house and commanded the defendant to leave, and at the same time, he walked toward and around Elisa and her father. He went up to the defendant and began to push him. The defendant's witnesses contend that the uncle slapped the defendant. In any case, Elisa's father attempted to restrain his brother by holding to him and the defendant. At that point, Anthony Wayne Benjamin fired his rifle. He said he fired it in the air to scare the defendant. The proof clearly shows that Anthony Wayne and Mrs. Kathryn Benjamin started running down toward where Claude Allen Benjamin was. The testimony for the state contends that the defendant had already shot the deceased Claude Allen Benjamin. The defendant's testimony is to the effect that Anthony Wayne Benjamin fired a second shot and hit the defendant in his left arm before he fired. In any case, Mrs. Kathryn Benjamin testified that "and he shot my husband and he never did quit firing. *247 He just kept firing." Elisa's father testified that he called to his son to kill the defendant after the defendant ceased firing and had thrown his pistol at him. The sixteen-year-old son Tony began to fire a .22 rifle at the defendant. He says he did not know about the previous altercation. Anthony Wayne Benjamin and his mother testified that Anthony Wayne fired his second shot after he had been wounded in both shoulders at the time he was falling to the ground. Of course, the defendant's testimony is that defendant had been wounded before he began to fire his pistol.
In any case, however, the testimony clearly shows that the defendant did not act in any manner hostile to any of the state witnesses until after he had been attacked by Claude Allen Benjamin; that he did not know Claude Allen Benjamin and had only seen Anthony Wayne one time. He had always been friendly toward Elisa's father. He asked, and was granted, permission to talk to Elisa and while talking to her, Anthony Wayne shot to scare him and Claude Allen assaulted him.
This is the testimony offered by the state as having occurred at the scene of the homicide. To this testimony was added the opinion testimony of a pathologist as to the position of the right arm of the deceased at the time the fatal shot was fired, and the testimony of the sheriff that he found only one spent 30/30 cartridge shell and one live 30/30 cartridge; that he found no .22 caliber cartridge shells at the scene of the homicide.
The defendant offered the testimony of Elisa, who testified that her uncle slapped the defendant. Elisa's mother testified that she talked with her former husband, Charlie Ed Benjamin, and he told her that Elisa's story was true; that Elisa had said her uncle had slapped the defendant and two shots were fired before the defendant began to fire.
The defendant testified that he was wounded in the left arm before he fired at the man with the rifle twice, and then at the man to his left [the man who had slapped him]. He said he did not know the people who attacked him except he had seen Anthony Wayne Benjamin one time. He said that the reason he shot the two Benjamins was because, "I was scared. They both had already attacked me." He said that after Anthony Wayne went down, "He was still moving, as he went down, he started trying to rebreech his gun."
Under this close resume of facts, the court permitted a pathologist to testify as an expert witness as to the position of the deceased's right arm at the time the fatal shot was fired. The following colloquy occurred:
"Q. Now, Dr. Welch, I am going to ask you again, the position of the decedent Claude Allen Benjamin's right arm, at the time when this wound was inflicted, explain that to the jury, please, sir.
BY MR. KELLEY: If it please, Your Honor, he is not qualified to testify as to what position Mr. Claude Allen Benjamin was in at the time of the fatal encounter: (1) That invades the province of the jury; it is a jury matter. (2) He is not qualified to answer.
BY JUDGE SENTER: Counsel, as I recall the doctor's testimony, he elaborated, regarding the path of the projectile, as to the position the arm would have had to be in in order for the projectile to take a particular path. Therefore, [I] feel that he may testify. The objection is overruled.
BY MR. DAVIDSON:
Q. Dr. Welch, my question, what position would the right arm of the decedent, Mr. Claude Allen Benjamin, would have had to have been in *248 for this wound to have been inflicted in the manner that it was?
A. It had to be placed across his chest, because the single wound involved, involved a projectile entering the arm on this surface of the arm, passing virtually straight through the arm and into the nipple. And I think it is fairly obvious that the only position that would satisfy this set of circumstances is with the arm across the chest in such a manner.
Q. Doctor, I will ask you further, could the arm have been extended, or out, or is it your testimony that it had to be up tight against his body?
A. It is my opinion 
BY MR. KELLEY: If the Court please, we would like to interpose, a continuing objection, if it may please Your Honor.
BY JUDGE SENTER: The record may note the objection. The objection is overruled.
BY THE WITNESS:
A. It is my opinion that the arm was placed next to the chest because of the fact that when the arm was placed, at autopsy, when the arm was placed across the decedent's chest, when the wound of entry and the wound of exit on the interior portion of the arm and the wound of entrance at the nipple were all placed in direct alignment, the arm was in this position, touching the chest, and a probe could be passed through the wound, all the way through the arm, and touch the wound of entry in the nipple."
The brief filed by the attorney general admits that the authorities show that it was an error to permit the introduction of this testimony, but contends that it was harmless, as follows: "Although the testimony was inadmissible, it did not preclude the jury from having reasonably considered appellant's version, being that the deceased, regardless of the position of his arm, had a weapon in his hand and was advancing on appellant."
Of course, the purpose of this testimony was to indicate that the deceased had his arm up on his chest and not down by his side "with something `flashy'" in his hand.
This Court has condemned this type of testimony throughout its history. As early as 1893 in the case of Foster v. State, 70 Miss. 755, 12 So. 822 (1893), we pointed out in a lengthy opinion as shown by the first syllabus:
"On a murder trial it is error to permit experts to give opinions as to the range of the bullet which passed through deceased's head, or the position of his hand and arm, when he was shot in the arm and body, where they are formed from proven facts, since it is for the jury to draw their own conclusions." 12 So. at 822.
The Foster case was cited as authority by the Court of Appeals of Alabama in the case of Rigell v. State, 8 Ala.App. 46, 62 So. 977 (1913), in which the Court said:
"In the Encyclopedia of Evidence, vol. 5, p. 588, we find the following text: `According to the overwhelming weight of authority, the opinions of medical experts are not admissible to show the poposition of an injured person at the time the wound was received, or the position of the person who inflicted it, because, as has been said, surgeons are not presumed to be experts in the matter of giving or receiving wounds, and the jury are equally capable of drawing proper inferences from the facts proved.' The long list of cases cited in the note fully sustain the text. See in connection, as of similar purport, the following cases: Foster v. State, 70 Miss. 755, 12 So. 822; McKee v. State, 82 Ala. 32, 2 So. 451; Dumas v. State, 159 Ala. 42, 44, 49 So. *249 224, 133 Am.St.Rep. 17." 8 Ala.App. at 55, 62 So. at 980.
See also Mathis v. State, 15 Ala.App. 245, 73 So. 122 (1916).
This evidence was also condemned in Cobb v. State, 226 Miss. 181, 83 So.2d 833 (1955) and Harris v. Pounds, 185 Miss. 688, 187 So. 891 (1939).
This rule seems to be universally accepted. See People v. Curtright, 258 Ill. 430, 101 N.E. 551 (1913); Keifer v. State, 199 Ind. 10, 154 N.E. 870 (1927); Manning v. State, 7 Okl.Cr. 367, 123 P. 1029 (1912); Roquemore v. State, 59 Tex.Cr. 568, 129 S.W. 1120 (1909).
The testimony of the pathologist as to the position of the deceased's arms at the moment of the fatal shot was a serious error, because it added the opinion of an eminent medical doctor to the weight of the testimony of the Benjamin family as to how the homicide occurred when, in fact, the testimony on this point was outside the expertise of the doctor. It is within the province of the jury to determine whether one is shot twice or whether one bullet passed through the arm and body of the deceased and is not an issue for an expert to decide.
It is next contended that the trial court committed a reversible error in failing to give the defendant an instruction stating that if the life of the defendant had been threatened and he had good reason to apprehend a serious attack he had the right under the law to arm himself by carrying a concealed weapon, and was not required to temporarily disarm himself whenever he was in no apparent danger.
A similar instruction has been denied in several cases in this state. See Shannon v. State, 237 Miss. 550, 115 So.2d 293 (1959); Durham v. State, 158 Miss. 833, 131 So. 422 (1930); Molphus v. State, 124 Miss. 584, 87 So. 133 (1921).
Such an instruction has been permitted in Wood v. State, 165 Miss. 363, 144 So. 545 (1932); Echols v. State, 99 Miss. 683, 55 So. 485 (1911); Klyce v. State, 78 Miss. 450, 28 So. 827 (1900); and Smith v. State, 75 Miss. 542, 23 So. 260 (1898).
In Molphus v. State, 124 Miss. 584, 87 So. 133 (1920), the Court pointed out that an instruction granted the defendant on "carrying a concealed weapon was certainly all he could ask." Another instruction on this subject was not warranted. The Court then said:
"The defendant was not on trial for carrying a concealed weapon, and the court was not required to instruct as to his right to carry a weapon. The court was here dealing with the use of the weapon and lawfulness of the use, and not with the lawfulness of its being carried. So we think there was not error in refusing the instruction No. 2 above set out which was refused by the court." 124 Miss. at 597, 87 So. 135.
The foregoing statement was approved in Durham, supra.
Mrs. Kathryn Benjamin testified that she did not remember telling her husband and son to come back that "There isn't any trouble out there." Then, she said, "He come out there for it, or he wouldn't have had a gun with him." [Referring to the defendant].
On cross-examination of Elisa Streetman, she was asked by the prosecuting attorney: "Isn't it a fact, Mrs. Streetman, that on that occasion [when her father came after her] you told you father, `Daddy, there is going to be trouble. He [speaking of defendant] has got a gun, and he might kill you and Tony, too.'" She answered, "No."
"Q. You deny telling your father that?
A. I did not say he would kill nobody. I did say he had a gun.
Q. `And he might kill you and Tony, too.'
A. No. I didn't say he was going to kill anybody."
*250 Mrs. Streetman was also asked if she did not tell the sheriff that, "I have known Ray Austin for about six months. I had been on a date with him today. Jackie Nix and his girlfriend were with us. We stopped at the K & K Truck Stop, and I called my father to come after me because I was afraid of Ray, because last Wednesday he said that he wasn't going to live without me and that he would kill us both. He had taken his gun out and it went off and shot him in the leg."
She admitted that she made such a statement, but said it was done with her father's help.
The record in this case reveals that the state not only sought to prove a felonious homicide, but also that the homicide was caused as a result of the fact that the defendant was guilty of unlawfully carrying a concealed weapon.
The defendant testified that his life had been threatened and that the sheriff made him a deputy sheriff, and for that reason he carried a pistol. The sheriff was then permitted to construe Mississippi Code Annotated § 97-37-9 (1972) by testifying that although he made him a deputy, that gave him no right to carry a concealed weapon. This, of course, was error.
We hold under the peculiar facts in this case that the court should have given the jury an instruction on the right of one to carry a deadly weapon under the statute.
We are of the opinion that the testimony offered by the state was sufficient to withstand the motion made by the defendant for a directed verdict.
On the other hand, the testimony shows that the state's witnesses were the aggressors and that the deceased Claude Allen Benjamin attacked the defendant at a time when he had permission of Elisa's father to talk to her. If the testimony is sufficient to show an unlawful killing, it does not show murder. Since there was obviously no malice on the part of the defendant shown in the sudden attack admittedly made on him, the charge should have been limited to manslaughter.
Mississippi Code Annotated § 97-3-35 (1972) is in the following language:
"The killing of a human being, without malice, in the heat of passion, but in a cruel or unusual manner, or by the use of a dangerous weapon, without authority of law, and not in necessary self-defense, shall be manslaughter."
We considered two of the manslaughter Code sections in Wells v. State, 305 So.2d 333 (Miss. 1974). This was a case where the defendant did not know the deceased and cut him in a sudden affray. The deceased died from the wound. All the Supreme Court Justices agreed that the offense could rise no higher than manslaughter; but, since there was no other error in the trial record, a majority of the Court felt that the case should be reversed for sentence of manslaughter only.
In the instant case, however, there are several reversible errors in the trial of the case which may or may not change the verdict of the jury as to the guilt or innocence of the defendant as to manslaughter.
We, therefore, reverse the judgment of the trial court and direct that the case be retried before a new jury to accord with the foregoing opinion.
Reversed and remanded.
GILLESPIE, C.J., and PATTERSON, ROBERTSON, SUGG, WALKER and BROOM, JJ., concur.