524 So.2d 957 (1988)
Dorothy Elizabeth MAY
v.
STATE of Mississippi.
No. 57357
Supreme Court of Mississippi.
April 20, 1988.
*959 Thomas A. Coleman, J.P. Coleman, Coleman & Coleman, Ackerman, for appellant.
Edwin Lloyd Pittman and Mike Moore, Attys. Gen. by Jack B. Lacy, Jr., Sp. Asst. Atty. Gen., Jackson, for appellee.
Before DAN M. LEE, P.J., and ANDERSON and SULLIVAN, JJ.
DAN M. LEE, Presiding Justice, for the Court:
Dorothy Elizabeth May was indicted, tried and convicted of murdering her husband, James L. May. She appeals the conviction and sentence to life in the custody of the Mississippi Department of Corrections. She assigns these errors:
I. THE TRIAL COURT ERRED BY ADMITTING INTO EVIDENCE OVER APPELLANT'S OBJECTION THE OPINION OF THE PATHOLOGIST WHO PERFORMED THE AUTOPSY ON THE BODY OF JAMES L. MAY, DECEASED, DR. RODRIGO GALVEZ, THAT JAMES L. MAY'S WOUND WAS NOT A CONTACT WOUND.
II. THE TRIAL COURT ERRED WHEN IT ADMITTED INTO EVIDENCE THE OPINION OF THE SAME DR. RODRIGO GALVEZ, M.D., THAT MOST SUICIDES SHOT THEMSELVES IN AREAS OF THEIR BODY OTHER THAN WHERE JAMES L. MAY'S WOUND WAS LOCATED.
III. THE TRIAL COURT ERRED WHEN IT OVERRULED APPELLANT'S MOTION TO STRIKE THE TESTIMONY OF MRS. PHRONIE BELL HUNT ON THE GROUNDS THAT APPELLANT'S ATTEMPT TO POISON HER HUSBAND, JAMES L. MAY, WAS TOO REMOTE IN TIME TO BE RELEVANT.
IV. THE TRIAL COURT ERRED WHEN IT ADMITTED INTO EVIDENCE THE TAPE RECORDING OF MRS. INNIE PEARL CARTER ROBINSON'S INTERROGATION OF APPELLANT, MRS. DOROTHY ELIZABETH MAY.
V. THE TRIAL COURT ERRED WHEN IT PERMITTED CHOCTAW COUNTY SHERIFF BOYCE BRUCE AND MISSISSIPPI INVESTIGATORS BILLY GORE AND JERRY BUTLER TO TESTIFY ABOUT WHAT THEY HEARD OF MRS. ROBINSON'S INTERROGATION OF APPELLANT, MRS. DOROTHY ELIZABETH MAY.
VI. THE TRIAL COURT ERRED WHEN IT OVERRULED APPELLANT'S MOTION FOR A DIRECTED VERDICT OF NOT GUILTY WHICH SHE MADE AT THE CONCLUSION OF THE PRESENTATION OF THE STATE'S CASE AGAINST HER.
VII. THE TRIAL COURT ERRED WHEN IT OVERRULED APPELLANT'S MOTION FOR A PEREMPTORY INSTRUCTION WHICH SHE MADE BY AND THROUGH HER ATTORNEY OF RECORD AT THE CONCLUSION OF THE PRESENTATION OF ALL EVIDENCE DURING THE TRIAL OF THIS CASE.
VIII. THE TRIAL COURT ERRED WHEN IT OVERRULED DEFENDANT'S MOTION FOR NEW TRIAL.
Finding no reversible error, we affirm.

I.

FACTS
James L. May was found shot to death in his bedroom sometime between 6:30 and 6:45 on the morning of October 30, 1984. Mrs. Dorothy Elizabeth May, the deceased's wife, told police that May asked her to go check on the dogs the couple kept in the backyard. She had not gone far when she heard a shot and returned to the house whereupon she looked inside and saw May lying on his side on the bed. She thought he was dead, and ran the short distance to May's mother's house, and the two returned to the bedroom at which time May's mother turned May on his back to check for signs of life. Next to him lay a double-barrel shotgun. Mrs. May told police that she loaded the shotgun for her husband the night before because he could not do it for himself and he planned on *960 going squirrel hunting the next morning. He died of a wound to the neck near the jaw, below the right ear.
By some reports, May had been sickly and depressed; however, police quickly came to suspect May's death was not a suicide.
The investigation turned up evidence pointing to homicide, and on November 16, 1984, Choctaw County Sheriff Boyce Bruce and investigators of the Mississippi Highway Patrol arrested Dorothy Elizabeth May. She was indicted in the February 1985 term of the Choctaw County grand jury. After a continuance at defendant's request, trial commenced February 26, 1986.
The evidence showed that in May 1984 Mr. May had been hospitalized in Eupora, then moved to a hospital in Tupelo. Later he was a patient at the Methodist Rehabilitation Center in Jackson, Mississippi. However, there was no testimony as to what, if any, diagnosis was made. May's son, Charles Edward May, said he never spoke with his father's doctors or with his mother about the cause of Mr. May's illness. None of May's doctors testified, nor did Mrs. May take the stand in her defense.
The state sought to show that Mr. May's illness was caused by Mrs. May, but that when it appeared he would recover, she killed him. The state produced witnesses who testified they heard Mrs. May say that she wanted to kill her husband so she could collect on his insurance policies.
Mrs. May formerly drove a school bus for the Choctaw County School District. Tina Beecher, who rode on the bus driven by Mrs. May, testified Mrs. May asked her on several occasions how could she get rid of her husband without losing everything.
Rudolph Carter, son of one of Mrs. May's friends and with whom Mrs. May had a "close relationship," testified that 30 or 40 times between January 1984 and May 1984 Mrs. May told him she wanted to get rid of her husband. At first she wanted someone to kill him and then she asked Rudolph to kill him for her. It had to look like an accident, she said, so she could collect the insurance and live her life without her husband's interference, Carter testified. Then she said if she could not find someone else to do it, she would do it herself. Mrs. May suggested to Rudolph that they could run away to Texas together and spend the insurance money without anyone knowing.
Carter further testified that Mrs. May told him she tried to poison Mr. May by putting rat poison in his food, but this did not kill him. She also told him she tried to give him sleeping pills in his food, but he did not eat enough of the food to affect him.
Ray Lampard, a substitute school bus driver who worked with Mrs. May during the spring of 1984, testified that one day in the parking lot Mrs. May brought up the subject of her husband. She asked Lampard what kind of poison she could use to kill her husband. Lampard said he asked why and she responded that she wanted to kill him so she could get insurance money and go to Texas with Rudolph Carter.
Dwight Robinson, a 17-year-old who on rode Mrs. May's bus, testified that she asked him how long it took before a dead body got stiff. She told him she was going to put rat poison in her husband's food and was going to collect the insurance money and withdraw other money out of the bank.
Larry David Carter, another son of Innie Pearl Carter Robinson, Mrs. May's close friend, testified that he met Mrs. May at a florist's shop where she offered him $5,000 to kill her husband, which he declined. She told Carter that Mr. May had wanted to go to the bank in Eupora to withdraw his money after he became sick, but Mrs. May had already spent it.
Mrs. Innie Pearl Carter Robinson and Phronie Bell Hunt both testified that Mrs. May told each of them she had given rat poison to Mr. May. They reported this to a Dr. Pennington, but Dr. Pennington did not testify at the trial.
Frances Blake, a worker at the Four-Way Superette, testified that Mrs. May often bought gasoline at the store and they would talk about her husband's health. Ms. Blake said one day she inquired of Mrs. May how her husband was doing and *961 Mrs. May replied, "Well, Frances, in spite of all my attempts to kill him, it looks like he's going to live." Mrs. May did not smile when she said this.
Post mortem tests on hair and fingernail samples taken from May's body showed he had increased levels of arsenic, a common ingredient in rat poison. J.C. Smiley, forensic toxicology expert, testified that there was approximately 10 times more arsenic in the fingernail samples than would be considered normal. The arsenic level in the hair samples was almost twice what is considered normal. Smiley said he found no traces of arsenic in the liver, a main repository for poison in the body. This could have meant there was no recent ingestation of arsenic, or that ingestation was at a much earlier date. Smiley testified there could have been industrial-related reasons for the presence of arsenic, and he did not know Mr. May's work background.
The state introduced physical evidence and expert testimony to negate the possibility of suicide.
Dr. Rodrigo Galvez, a pathologist who qualified as an expert witness, testified that May died of a gunshot that entered the right side of the neck at the mandibular angle, just below the jaw near the ear. The wound itself covered 2-1/2 to 3-1/2 centimeters. Galvez found shotgun shot and wadding in the wound. Death was caused by shot travelling up through the brain.
One of the main factual questions for the jury to resolve was whether the shot was fired at a range close enough to suggest self-infliction.
The left barrel of the double-barreled shotgun found by May's body contained an expended hull; the right barrel contained an unfired shell. Since May was supposedly found on his left side, Investigator Jerry Butler of the Mississippi Highway Patrol measured May's reach on his right arm. From the wound to the furthest tip of May's longest finger on his right hand was a distance of 32-1/2 to 33 inches. The distance from the tip of the shotgun barrel to the trigger for the left barrel (which was slightly behind the right barrel trigger) was 29 inches. Thus, for May to have fired the fatal shot, the barrel would have had to have been within roughly four inches of May's throat.
Steve Byrd, Mississippi Crime Laboratory forensic scientist, testified as a firearms examination expert. Byrd testified he test-fired the shotgun found by May's body, and the size of the wound most closely corresponded to the dimensions of a shot fired from a distance of 42-54 inches; however, Byrd said a "sooty area" or ring of 3-1/2 inches by 5-1/2 inches would be consistent with a shot fired from six inches away.
The court found Dr. Galvez qualified to render an opinion on whether the wound was a contact wound. From the skin pattern, and from the powder deposits around the wound, Dr. Galvez stated that in his opinion the wound was not a contact wound. Dr. Galvez also stated that in his opinion the location of the fatal wound was not consistent with the location of a self-inflicted gunshot wound.
The state also introduced statements Mrs. May made to Innie Pearl Carter Robinson some days after the crime while visiting Mrs. Robinson. Investigators Butler and Billy Mack Gore and Sheriff Boyce Bruce enlisted Mrs. Robinson to put a transmitter and a tape recorder in her bedroom. Either November 15 or 16, 1984, but before Mrs. May's arrest, the authorities placed a wireless transmitter behind Mrs. Robinson's television, and placed a tape recorder under her bed.
Butler, Gore and Sheriff Bruce all testified that over the transmitter they heard Mrs. Robinson say to another person, "I didn't think you had the nerve to do it." The other person responded, "he never knew what hit him." The officers also overheard the other person talk about using a pair of red gloves to avoid leaving fingerprints. Mrs. Robinson testified that the other voice was that of Mrs. May, and she remembered the same exchanges to which the officers testified.
The wireless transmission was not very clear in many spots, mainly because the microphone was a distance away and the *962 two persons talked in a whisper, Butler testified. Likewise, the tape recording was muffled in spots because it was hidden. The original recording and an enhanced version were played for the jury. A transcription appears in the record, but the jury did not have the transcript, nor were the tapes carried to the deliberation room.
Mrs. May objected to introduction of any of these statements because they were elicited by a police agent. The court overruled this objection.
In her defense, Mrs. May introduced evidence that the fatal shot was fired from very close range, and her ballistics expert, Charles Leland Quarles, testified that the vapor ring, or sooty ring, around the wounds suggested the muzzle was very, very close  less than two inches away. Quarles acknowledged, however, that the size of the wound corresponded to that of a shot fired from a much greater distance, perhaps four feet.
Mrs. May also introduced two witnesses who stated Mr. May had been depressed about his health. Charles Thomas, Choctaw County School District Assistant Superintendent, testified he saw May with the defendant at a football game September 21, 1984, and May seemed at a "low ebb." May told him, "it's no use, I don't seem to be getting any better." Thomas took this to mean May was giving up on life.
Charles Edward May, the deceased's son, testified that though his father's health had been improving, his mind was not. Charles said his father was still negative about everything. He never said he was getting better. On several occasions Mr. May stated, "If I'm not going to get any better, I just don't want to live any more." Charles said his father did not want to become an invalid, like his own father. The weekend before the Tuesday shooting, May had asked his son to come home from college for a visit, stating, "I may never see you again."
In rebuttal, the state showed that May's health was improving during the weeks before his death. Though he had trouble walking during the worst part of his illness, May had been walking about three miles a day. Walter Murphy, Choctaw County Supervisor and May's friend, said he spoke with May in his yard the Sunday before he died. May said he had made two trips to Tomnolen, a distance of about three miles round trip, and he was looking forward to getting back to work. Murphy said May appeared to be in good spirits. Allen Pyron testified May walked by his body shop about two weeks before his death. May told him he felt fine, that he had been walking a good bit every day, and was looking forward to doing some hunting with his young hunting dogs. Pyron said just a couple of months before he had seen May in a wheelchair at a summer league baseball game.
The trial court denied Mrs. May's request for a directed verdict at the close of all the evidence, and the jury returned a verdict of guilty as charged. Following denial of her motion for a new trial, Mrs. May timely perfected this appeal.

II.

Did the Trial Court Err in Allowing Witness Dr. Galvez to Give Various Expert Opinions?
Here Mrs. May argues the trial court erred in allowing Dr. Rodrigo Galvez to give two expert opinions; first, that Mr. May's wound was not a contact wound, and, second, that the location of Mr. May's wound was not consistent with the usual location of self-inflicted gunshot wounds.
Taking the first opinion, Mrs. May argues that the case of Austin v. State, 324 So.2d 245 (Miss. 1975), requires reversal.
In Austin this Court held it error to allow a pathologist to testify to the position of a shooting victim's arm at the time the fatal shot was fired, when the question was whether the victim had been an aggressor. Id. at 248. The obvious rationale of the Austin decision in the murder/self defense context is that such testimony would amount to an opinion on the ultimate fact, effectively invading the province of the jury. See Taylor v. State, 452 So.2d 441, 449 (Miss. 1984) ("Where insanity is not the defense, the determination of the ultimate *963 fact of murder or manslaughter is left to the jury and is not subject to expert opinion testimony.") (citing Austin v. State, 324 So.2d 245 [Miss. 1975]).
We decided Austin, however, based on our law of evidence prior to our Rules of Evidence. Mrs. May was tried in February 1986; thus, this case is governed by the Mississippi Rules of Evidence, and Austin is of value only to the extent it is consistent with the Rules. See M.R.E 1103.
Under M.R.E 702:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
The comment makes clear that Rule 702 "does not relax the traditional standards for determining that the witness is indeed qualified to speak an opinion on a matter within his purported field of knowledge. Nor does 702 relax the requirement that the scientific principle from which the expert's opinion is derived `must be sufficiently established to have gained general acceptance in the particular field to which it belongs.'" The comment specifically cites House v. State, 445 So.2d 815 (Miss. 1984), for a useful guide to what fields of knowledge have gained "general acceptance."
There can be little question that forensic pathology is a field of knowledge having gained "general acceptance." Dr. Galvez was qualified to testify as an expert in forensic pathology. Likewise, forensic psychiatry is recognized as a proper field of expertise, especially for competency determinations.
Mrs. May objects that Dr. Galvez should not have been allowed to testify to his opinion that Mr. May's wound was not a contact wound because he lacked ballistics training. This appears to be essentially a complaint that Galvez was testifying outside his area of expertise.
However, as the state notes, Dr. Galvez testified on voir dire that he had examined approximately 150 gunshot wounds and, based on this and other training and experience, including "much training in ballistic areas," the trial found Dr. Galvez qualified to render an opinion on whether Mr. May was killed by a contact wound. Generally, under our new Rules of Evidence, the decision of whether or not an expert witness is qualified to testify is within the trial court's discretion. See Detroit Marine Engineering v. McRee, 510 So.2d 462, 467 (Miss. 1987); Hooten v. State, 492 So.2d 948 (Miss. 1986). The test is whether a witness "possesses peculiar knowledge or information regarding the relevant subject matter which is not likely to be possessed by a layman." McRee, 510 So.2d at 467; Henry v. State, 484 So.2d 1012, 1015 (Miss. 1986). There does not appear to be an abuse of discretion in allowing Dr. Galvez to testify concerning the proximity of the firearm to the wound.
It is not clear, however, that the location of an upper body wound has been accepted by the field of forensic psychiatry or forensic pathology as a general indication of whether the wound was self-inflicted. Thus, Dr. Galvez's observation may be nothing more than that. This type of opinion seems more like the type of conjecture or speculation that should not be admitted.
Mrs. May also suggests that it was error to allow Dr. Galvez to give his opinion that Mr. May's wound was not consistent with what is normally found to be the location of a self-inflicted wound. This seems more a question whether Dr. Galvez should have been allowed to express an opinion on the ultimate fact. Courts have been divided on whether expert testimony should be allowed on the question of whether a wound is self-inflicted. See Annot., "Admissibility, in homicide prosecution, of opinion evidence that death was or was not self-inflicted," 56 A.L.R.2d 1447 (1957 & Supp.). The majority of courts that have considered the question, however, hold that such opinions are generally admissible. This, of course, would seem to be the proper rule in light of Rule 704, which does not *964 preclude opinion evidence on the ultimate issue.
Every expert opinion embracing the ultimate fact is not per se admissible, however. The opinion still must be helpful to the trier of fact. Hughes v. Tupelo Oil Co., Inc., 510 So.2d 502 (Miss. 1987); Dale v. Bridges, 507 So.2d 375 (Miss. 1987). "Questions which simply allow the witness to tell the jury what result to reach are impermissible, as are questions asking the witness for a legal conclusion." Dale, 507 So.2d at 378, see Owen v. Kerr-McGee Corp., 698 F.2d 236, 240 (5th Cir.1983). The court in Owen noted, however, that "the task of separating impermissible questions which call for overbroad or legal responses from permissible questions is not a facile one." 698 F.2d at 240.
Having in mind these standards, it seems to us that the prosecution's questions did not elicit overbroad or legal responses. This is the exchange of which Mrs. May complains:
Q. Dr. Galvez, can you tell the jury whether or not what is reflected in your psychiatric literature to which you have referred, and in your own experience as a psychiatrist/pathologist, that you have been able to detect any pattern or patterns of gunshot wounds made by shotguns with any individuals who have committed suicide by the use of a shotgun?
A. Yes, sir.
Q. Would you tell the jury what those are, please?
A. Well, usually, the individual will put the muzzle inside the mouth, or either to the side of the head, and the side of the head would be dictated by whether the person was right-handed or left-handed. That is the first choice. And, another choice is aiming at the heart, and the abdomen.
Q. And, Doctor, when you say to the side of the head, to what area are you referring?
A. To the temple area, either the right temple or the left temple.
BY MR. LACY: We have no further question, your honor.
(R. 295)
These questions did not evoke an overbroad or legal response. The opinion was reasonably factually specific to the question of whether this particular wound was similar to those found on other suicide victims.
This does not in and of itself decide admissibility, however. As noted above, the opinion must still be "helpful to a determination of the case." See the official comment to M.R.E. 704. In other words, the opinion must be helpful to the trier of fact. Thus, an opinion which covers facts within the common knowledge or experience of lay people will not be helpful and therefore inadmissible. See Scott v. Sears, Roebuck & Co., 738 F.2d 269 (8th Cir.1984).
Although the testimony outlined above may approach simple conjecture, we think it sufficiently outside the common experience to be the subject of a "helpful" expert opinion.
Dr. Galvez gave specific, detailed reasons why he thought May's wound was not the result of contact or close proximity of the shotgun barrel to the skin. Galvez only testified that from reading studies and from his experience in studying self-inflicted gunshot wounds, individuals committing suicide usually put the gun muzzle to the side of the head at the temple, or put it inside the mouth, or aim it at the heart or the abdomen. Thus, the opinion is not objectionable on the grounds that the basis of the opinion was not divulged.
In all, we find no reversible error in allowing either opinion into evidence.

III.

Did the Trial Court Err in Overruling Mrs. May's Motion to Strike Testimony from Mrs. Phronie Hunt Concerning Other Remote Crimes?
Here Mrs. May argues that the trial court committed reversible error in allowing Mrs. Phronie Hunt to testify that in 1983 she heard Mrs. May state she tried to *965 poison her husband. As noted in Part I, Mr. May's death occurred October 30, 1984.
Obviously, the testimony was admitted as going to show Mrs. May's intent to kill her husband. M.R.E. 404(b). See Steed v. State, 396 So.2d 625, 627 (Miss. 1981).
The only authority Mrs. May cites for her proposition are two cases dealing with remote threats against defendants who many months later assaulted the persons voicing the threats. Stewart v. State, 226 So.2d 911, 912 (Miss. 1968); Myers v. State, 167 Miss. 76, 147 So. 308 (1933). In both cases the Court found the threats too remote. Obviously, a plea of self defense carries with it a requirement that the threat be contemporaneous with the act of defense, at least to the point that the actor had a reasonable belief of impending harm. No compelling contemporaneousness is required for intent. However, even if Mrs. Hunt's testimony involved an incident too remote to be relevant, several other persons testified to similar threats during the spring of 1984, at most 10 months before Mr. May's death. Any error in admitting Mrs. Hunt's testimony was surely harmless.
Sensing the harmlessness of Mrs. Hunt's testimony, Mrs. May argues it was error to allow all the other testimony concerning her prior attempts to kill her husband. She cites no authority to support her additional claim of remoteness; however, some pre-Rules precedent might support her claim.
Steed v. State, 396 So.2d 625, 627 (Miss. 1981), and Grooms v. State, 357 So.2d 292, 295-96 (Miss. 1978), both dealt with remoteness of threats made by a defendant about a victim, uncommunicated to the deceased. In both of those cases the Court intimated that threats made within two months of the killing were not too remote. In Parr v. State, 362 So.2d 634, 636 (Miss. 1978), the Court approved of admitting evidence of threats made as much as 13 months before the killing. However, in that case the Court noted, "The record indicates that for a period before the threats were made up until the date of the homicide, there was hostility, bitterness, and ill will between appellant and his wife [the deceased]. Such a situation rendered the threats relevant and competent."
Thus, this Court's pre-Rule precedent seems to hold that threats made within two months of the killing are not too remote, and threats more remote may be admissible where there are linking contemporaneous threats as in Parr. On the other hand, the Court noted in Steed, Grooms and Parr that whether a threat is too remote is a question addressed to the sound discretion of the trial judge. Steed, 396 So.2d at 627.
The analysis under the new Rules of Evidence may incorporate our pre-Rules precedent to some extent. Rule 404(b) states that evidence of "other crimes, wrongs, or acts" will be admissible to show intent, knowledge, preparation, plan, identity, or absence of mistake or accident. If threats made to a deceased are considered "other crimes, wrongs, or acts," then the focus should be on whether the trial judge abused his discretion under Rule 403, M.R.E., in admitting the evidence despite its prejudicial effect. If the threats do not fall under 404(b), the analysis is still essentially the same, since threats made to the accused not constituting another wrong could still be relevant under Rules 401 and 402 as showing intent or motive. See Jenkins v. State, 507 So.2d 89, 91-93 (Miss. 1987). Here the question of remoteness may re-enter the analysis as a question of relevancy. However, Rule 401 defines relevant evidence very broadly, and it would seem that evidence of threats made in early 1984, some 10 months before the murder, would have a tendency to "make the existence of any fact that is of consequence to the determination of the action more probable or less probable," especially in a circumstantial evidence case. The Court would thus again be faced with the question of whether the trial judge abused his discretion in admitting the testimony under Rule 403.
We hold that the trial court did not abuse its discretion in admitting testimony concerning prior murder threats made by Mrs. May against the deceased. The facts as detailed under Part I make clear that most *966 of the objectionable testimony covered the time between January 1984 through May 1984. In addition, Mrs. Robinson also testified to a more contemporaneous threat made by Mrs. May less than a week before Mr. May's death. Mrs. Robinson testified that the Friday before Mr. May died, Mrs. May told her that Mr. May had to be dead by Thursday next, and at this time Mrs. May even asked her if she would kill him. Thus, even were we to follow Parr, there was some evidence of a contemporaneous threat. There is no error.

IV.

Did the Trial Court Err in Admitting Into Evidence the Tape Recorded Admission by Defendant at a Time When the Corpus Delicti Had Not Been Proved?
Here Mrs. May argues that the state failed to meet its burden of establishing the corpus delicti of the crime. Specifically, Mrs. May argues that but for the statement elicited by Innie Pearl Carter Robinson, the corpus delicti was entirely circumstantial, and thus the state had the burden of proving the corpus delicti to the exclusion of every reasonable hypothesis other than that of the guilt of the accused. She argues that the state failed to meet this burden.
In Miskelley v. State, 480 So.2d 1104, 1107-08 (Miss. 1985), the Court dealt with the point at which a defendant's statements may be introduced to prove the corpus delicti. In holding that the corpus delicti of murder was sufficiently shown to warrant admitting defendant's statement to his girl-friend, the Court stated the following:
In Jackson v. State, 337 So.2d 1242 (Miss. 1976) the Court said:
It is contended that the corpus delicti was not sufficiently proven prior to the admission of the confession.
The corpus delicti in a homicide case consists of (1) the death of a human being, and (2) a criminal agency causing the death. The testimony showed that the body of the deceased was found at an unusual place under most unusual circumstances, bruised and swollen with indications of a rape attack. In our opinion, this was sufficient to establish criminal agency. This Court said in Buford v. State, 219 Miss. 683, 69 So.2d 826 (1954), as follows:
Where there has been a confession by the accused, much slighter evidence is required to establish the corpus delicti than would be necessary where the state must make out its entire case unaided by such confession. [Citations omitted]. The corpus delicti need not be established beyond a reasonable doubt but to a probability, and proof coupled with a confession may be considered as establishing the corpus delicti beyond a reasonable doubt. [Citations omitted]. Where there has been a confession by the accused, any corroborative evidence will be held sufficient which satisfies the mind that there is a real and not an imaginary crime to which the accused had confessed... . In a homicide case, the corpus delicti consists of the fact of death and the fact of the cause of death, and both such elements may be proved by circumstances... . Although the corpus delicti cannot be proved alone by the accused's confession, his criminal agency may be shown by his own confession. Roberts v. State, 153 Miss. 622, 121 So. 279, (Id. at 690, 69 So.2d at 830).
337 So.2d at 1248. See also Dycus v. State, 440 So.2d 246, 251 (Miss. 1983).
We are of the opinion that the evidence established the corpus delicti in this case.
See also Coulter v. State, 506 So.2d 282, 284-85 (Miss. 1987).
As in the case at bar, the Court in Miskelley did not have an eyewitness. Thus, at least criminal agency had to be proven by circumstantial evidence. No doubt the ultimate burden to prove corpus delecti remains on the state. According to Miskelley and cases cited therein, however, with only slight evidence the state may have the benefit of the accused's statements in meeting its burden.
Whether the state's burden was lightened because the confession is arguably *967 "direct" evidence, thus taking the case outside our rule covering cases built upon circumstantial evidence, is a question we need not reach. The jury was given circumstantial evidence instructions; thus, the question of whether the ultimate burden could have been lightened is unimportant.
Whether the evidence of corpus delicti is sufficient, even with the admission/confession, is another question. We think it is. There was expert testimony that the fatal shot was not self-inflicted; there was testimony that the defendant had threatened to kill the victim with the motive of collecting insurance money. Finally, there was the defendant's admission/confession that she shot the victim while he slept. This assignment of error is denied.

VI.

Did the Trial Court Err in Admitting a Tape Recording of a Statement Made by Mrs. May Prior to Her Arrest?
Here Mrs. May argues that Page v. State, 495 So.2d 436 (Miss. 1986), requires reversal because the recorded statement introduced at trial was taped by Innie Pearl Carter Robinson who was at that time an agent for Sheriff Boyce Bruce and investigators of the Highway Patrol.
As mentioned under Part I, Sheriff Bruce and investigators Jerry Butler and Billy Gore set up both a wireless transmitter and a tape recorder in Mrs. Robinson's bedroom on November 15 or 16, 1984. Mrs. Robinson then entertained Mrs. May, on November 16, at least a couple of hours before her arrest. Mrs. May made incriminating remarks overheard by everyone. The tape recording picked up some but not all of the remarks, and the tape is reportedly of poor quality. Afterward, authorities obtained a warrant and arrested Mrs. May.
In Nicholson v. State, 523 So.2d 68 (Miss. 1988) (Robertson, J., concurring), a majority of justices joined Justice Robertson's concurring opinion holding that the right to counsel attaches after a person has been arrested at the point the initial appearance under Rule 1.04, Miss.Unif.Crim. R.Cir.Ct.Prac., "ought to have been held... ." Id. at 77 (citing Page, 495 So.2d at 439). Since without doubt Mrs. May was not under arrest at the time these statements were elicited, her right to counsel for assistance at critical stages of the prosecution had not yet attached. Thus, she had no right to counsel and there is no right violated by obtaining her confession without first obtaining a waiver.
Likewise, there is no violation of Mrs. May's right not to incriminate herself under the Fifth Amendment to the United States Constitution. See United States v. Henry, 447 U.S. 264, 272, 100 S.Ct. 2183, 2188, 65 L.Ed.2d 115, 123 (1980); Hoffa v. United States, 385 U.S. 293, 304, 87 S.Ct. 408, 414-15, 17 L.Ed.2d 374, 382-84 (1966).
There being no violation of any right in obtaining the confession, the trial court did not err in allowing evidence of Mrs. May's statements.

VI.
Mrs. May does not separately argue her assigned errors seeking to assail the weight and sufficiency of the evidence. Since Mrs. May has cited no authority for these errors, this Court need not address them. Ramseur v. State, 368 So.2d 842 (Miss. 1978).
Under other errors, however, Mrs. May does suggest that the state's case is one where this Court should allow another jury to look at it. Shore v. State, 287 So.2d 766, 768 (Miss. 1974); Feranda v. State, 267 So.2d 305, 307 (Miss. 1972). The state correctly points out that this argument addresses whether a new trial should be granted.
In more recent precedent, this Court has focused on whether the trial court abused its discretion in denying defendant's motion for a new trial. See Wesley v. State, 521 So.2d 1283 (Miss. 1988); Weeks v. State, 493 So.2d 1280, 1283 (Miss. 1986); Gavin v. State, 473 So.2d 952, 956-57 (Miss. 1985). Under this approach there can be little question that the trial court did not abuse its discretion in denying Mrs. May's motion for a new trial.

*968 CONCLUSION
The trial court did not err in admitting expert testimony, or in admitting testimony concerning defendant's prior threats, or in admitting defendant's admission/confession because the corpus delicti was sufficiently established and it was not obtained in violation of any constitutional rights. Therefore, the judgment of conviction for murder and sentence of life of the Circuit Court of Choctaw County, Mississippi, dated February 27, 1986, is hereby affirmed.
AFFIRMED.
ROY NOBLE LEE, C.J., HAWKINS, P.J., and PRATHER, ROBERTSON, SULLIVAN, ANDERSON, GRIFFIN and ZUCCARO, JJ., concur.