# IN THE COURT OF APPEALS
## OF THE
## STATE OF MISSISSIPPI
### NO. 95-KA-01199 COA

**DON JERRELL WILLIAMS**                                                                 **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                                                   **APPELLEE**

THIS OPINION IS NOT DESIGNATED FOR PUBLICATION AND MAY NOT BE CITED, PURSUANT TO M.R.A.P. 35-B

| | |
|---|---|
| DATE OF JUDGMENT: | 09/06/95 |
| TRIAL JUDGE: | HON. L. BRELAND HILBURN JR. |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: SCOTT STUART |
| DISTRICT ATTORNEY: | EDWARD J. PETERS |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| TRIAL COURT DISPOSITION: | MURDER: SENTENCED TO SERVE A TERM OF LIFE IN THE MDOC |
| DISPOSITION: | AFFIRMED - 2/10/98 |

MOTION FOR REHEARING FILED: 2/13/1998

CERTIORARI FILED:4/15/1998

MANDATE ISSUED:

BEFORE THOMAS, P.J., DIAZ, AND KING, JJ.

KING, J., FOR THE COURT:

Don Jerrell Williams was convicted of murder in violation of Miss. Code Ann. § 97-3-19 (Rev.1994) in the Hinds County Circuit Court and sentenced to life imprisonment in the custody of the Mississippi Department of Corrections. Williams assigns nine errors on appeal:

> (1) The trial court improperly limited the cross-examination of pathologist Dr. Rodrigo Galvez and the introduction of possible mitigating and exculpating evidence.

> (2) The trial court improperly limited the cross-examination of Jeffrey Myers.

> (3) The jury was inadequately instructed on manslaughter and murder.

(4) The trial court erred in refusing to instruct the jury about malice aforethought and deliberate design.

(5) The trial court erred in refusing to give a cautionary instruction about accomplice testimony.

(6) The evidence did not adequately support a murder conviction.

(7) The sentence of the appellant was unconstitutionally disproportionate to the co- defendants' sentences.

(8) The jury was improperly instructed on reasonable doubt.

(9) The trial court erred in not giving a simple assault instruction.

We affirm the circuit court judgment.


## FACTS

During the early morning of May 27, 1994, Jessie Cutley began to walk from his cousin's house to his house located on Cherry Street in Jackson, Mississippi. As Mr. Cutley walked home, he eventually came into contact with Arnotia Baker, Kevin Smith, and Kevin's sister, Catrina Smith. Arnotia testified that as they walked from a store in the same area, she saw her father drive past on Terry Road. As she turned to the others and stated that her father had passed by, Mr. Cutley stopped in the street and smiled. Arnotia testified that Mr. Cutley must have thought she was speaking to him. At this point, Kevin went over to him and punched him in the head which made him fall down in the street. Williams, several other boys, and Kevin's other sister, Carla Smith, then walked up the street to where Mr. Cutley lay. They hit, kicked, and stomped him in the head, side and thighs as he bled in the street. Two of the boys also threw a water gun and a beer bottle at Mr. Cutley's body. Jackson police later found these items at the scene.

Different versions of how the beating began were given by Katrina, Arnotia, and Jeffery Myers, an accomplice in the beating. Katrina stated that Mr. Cutley called Arnotia a bitch. Arnotia initially stated in her police report that Mr. Cutley called her this name. However, she later denied that he made this statement, stating further that Kevin lied about the fact that Mr. Cutley called her a bitch. Arnotia testified that Mr. Cutley never called her any names, but merely acted friendly. It was her impression that Kevin merely wanted to start a fight with someone that morning. Jeffery testified that Mr. Cutley was minding his own business. He did not do or say anything to any member of their group to provoke them into a fight.

Katrina, Arnotia, and Jeffery also testified specifically that Williams was involved in the beating. Katrina testified that she saw Williams kick Mr. Cutley in the side and head and stomp him in the face. Arnotia testified that she saw Williams kick and hit Mr. Cutley in the side during the same time the others were kicking and hitting. According to Jeffery, Williams kicked Mr. Cutley in his ribs, legs, and head.

Williams, along with Katrina, Carla, Kevin, Jeffrey and several other boys were arrested for murder. Williams' motion to sever his case from the other defendants was granted. A trial was held and

Williams was convicted of murder and sentenced to life imprisonment. His motion for a new trial having been denied, he now appeals his conviction and sentence.

## ISSUES

## I. DID THE TRIAL COURT IMPROPERLY LIMIT THE CROSS-EXAMINATION OF PATHOLOGIST DR. RODRIGO GALVEZ AND THE INTRODUCTION OF POSSIBLE MITIGATING AND EXCULPATING EVIDENCE?

In Williams's first assignment of error, he argues that during the cross-examination of Dr. Rodrigo Galvez, the trial court improperly precluded the introduction of evidence contained in the coroner's report and toxicology reports ordered by Dr. Galvez. Williams argues that this evidence should have been allowed because it was relevant to who was the aggressor and demonstrated another possible intervening cause of death. After review of Dr. Galvez's cross-examination and Williams' proffer to demonstrate that Mr. Cutley was the aggressor and that his death resulted from another cause, we disagree.

The following proffer, in pertinent part, was elicited from Dr. Galvez by defense counsel regarding Mr. Cutley's cause of death:

Q. Now in this case, the autopsy--I mean the coroner's report states that there were subdural hematomas and congestive heart failure secondary to trauma.

A. Yes sir. Yes, sir, I read that , yes.

Q. Do you agree or disagree with that?

A. I told him that sir.

Q. You told him what?

A. That the --the congestive heart failure. I told him that . . . .

Q. And is there any relationship or have you ever seen congestive heart failure causally related or in any way causally related to alcohol use or cocaine use?

A. No, no, sir. No, no, no, no, no. You see, what happened here--

Q. Wait. Let me ask--

A. No, let me answer it.

Q. Okay.

A. Let me answer it. What happened, the man had numerous blows to the head, intracranial bleeding. I mentioned before there was an increased intracranial pressure, increased intracranial pressure pushing the brain down. That pressure slows down the heart beat and raises blood pressure. When a human being dies, at the end, heart stops. And with it stops, because the injuries in the head trigger the final cardiac failure. But it's not cardiac failure due to alcohol or

cocaine because the amount of alcohol that he had in his blood is no more than what you have after taking two or three martinis. It's a little bit over the legal limit, .1 and he had .28. It's not at a toxic level to cause death by alcohol ingestion.

Q. Does the amount of alcohol in his body affect the length of time that it would take him to die or affect the final heart stoppage?

A. It may affect it, but not--you mean that will make it faster or slower?

Q. In any way, timewise or in any in other way.

A. That amount, the only thing it will do will obscure the clinical finding; will be either he's drunk or it's consequences of intracranial bleeding, but it will not change the outcome.

Q. Okay. It won't change the outcome, but it will speed the outcome up?

A. No, no, it doesn't speed up the outcome, no.

This remaining portion of the proffer which concerns who was the aggressor was elicited from Dr. Galvez by defense counsel:

Q. And would --would alcohol and cocaine, do those drugs in combination have a tendency to make people aggressive?

A. Sometimes. It depends upon the individual. Some individuals, they have drinks we say have the happy wine. Other one, they have the sad wine, they cry, or they get violent. Other ones they go to sleep. It depends upon the individual. I don't know how [Mr. Cutley] act to alcohol.

Q. All right. What about cocaine? Does cocaine make people want to sleep?

A. Cocaine usually is a stimulant, yes.

Q. Now, did this individual have anything to eat recently, according to your autopsy?

A. According to my autopsy, no.

Q. He had not eaten recently?

A. Not according to my finding, no.

Q. And what is the relationship between food consumption and alcohol metabolism?

A. The alcohol may metabolize at the same rate without or with food. The only thing that changes is the absorption from your stomach. If you eat greasy meals, alcohol is absorbed slower than if you do not eat greasy meals; but the way the alcohol is broken down has nothing to do with food.

At the end of the defense counsel's proffer, he argued that the jury was entitled to know about the coroner's report, the aforementioned testimony and the toxicology reports. The trial judge initially overruled the state's objection to this evidence. However, after the state's cross-examination of Dr.

Galvez during the proffer, the trial judge sustained the objection.

"The right of confrontation and cross-examination . . . extends to and includes the right to fully cross examine the witness on every material point relating to the issue to be determined that would have bearing on the credibility of the witness and the weight and worth of his testimony". *Myers v. State*, **296 So.2d 695, 700 (Miss.1974)**. However, we find that the evidence Williams sought to introduce was irrelevant. The overwhelming weight of the evidence supports the assertions that (1) Mr. Cutley was not the aggressor of an altercation with Williams and the others and (2) Mr. Cutley's death was caused solely by several blunt blows to the head despite the presence of the cocaine and alcohol in his body. The proffer failed to reveal that Mr. Cutley initiated an altercation nor demonstrated that Mr. Cutley died from other causes.

It is true that one eyewitness, Katrina, testified that Mr. Cutley called Arnotia a derogatory name which reveals some potential for provocation. However, the record does not reveal that Williams was required to defend himself or defend the others against a physical attack from Mr. Cutley. Evidence as to whether Mr. Cutley was the aggressor was lacking. Williams's actions which contributed to and caused Mr. Cutley's death were not justified in the case *sub judice*. The trial judge did not err in limiting the cross-examination.

## II. DID THE TRIAL COURT IMPROPERLY LIMIT THE CROSS-EXAMINATION OF JEFFERY MEYERS?

In Williams's second assignment of error, he argues that the trial court improperly restricted cross-examination of Jeffery Myers. During this cross examination, defense counsel asked Jeffery if Williams was guilty of murder. The State objected, contending that the question called for a legal conclusion. The trial judge sustained the objection. Williams argues that because Jeffery was at the scene of the crime and perceived it as a lay witness, he should have been allowed to state whether Williams committed murder. We disagree. "Questions which simply allow the witness to tell the jury what result to reach are impermissible, as are questions asking the witness for a legal conclusion." *Dale v. Bridges*, **507 So.2d 375, 378 (Miss.1987)**; *May v. State*, **524 So.2d 957, 964 (Miss.1988).** Because Jeffery's answer would have required him to act within the province of the jury by deciding what result to reach, it was properly excluded. This assignment of error is without merit.

## III. WAS THE JURY ADEQUATELY INSTRUCTED ON MANSLAUGHTER AND MURDER?

In Williams's third assignment of error, he argues that the State's murder and manslaughter jury instructions were conflicting and confusing to the jury. He contends that neither instruction explained the difference between murder and manslaughter and the process by which, if the jury did not find all of the elements of murder, they may have considered manslaughter. This contention is without merit.

Instruction S-1 defines murder as "the killing of a human being, not in necessary self-defense, and without authority of law, by any means or any manner, when done with the deliberate design to effect the death of the person killed." Instruction S-4 defines manslaughter as "the killing of a human being in the heat of passion, without malice, in a cruel or unusual manner, without authority of law, and not in necessary self-defense." Both murder and manslaughter instructions tracked the exact language of Mississippi Code Annotated § 97-3-19 and § 97-3-35, respectively. It is clear to this Court that upon

deciding that Instruction S-1 was not supported by the evidence, the jurors would have instinctively turned to Instruction S-4 or vice-versa. We do not find that the instructions were conflicting nor confusing.

## IV. DID THE COURT ERR IN REFUSING TO INSTRUCT THE JURY ABOUT MALICE AFORETHOUGHT AND DELIBERATE DESIGN?

In Williams's fourth assignment of error, he contends that the trial judge improperly denied Instruction D-10, which requested that the jury be instructed on malice aforethought and deliberate design. We find that the trial judge did not abuse his discretion in this regard. Although the term "malice aforethought" was not used in any accepted jury instruction, the term "deliberate design" was used in Instruction S-1. Deliberate design is synonymous to malice aforethought and synonymous phrases or interchangeable words may be used in a jury instruction and the jury still be properly instructed. *Lancaster v. State*, **472 So.2d 363, 367 (Miss.1985)**. Though the precise definition of deliberate design was not given, this Court will not reverse for denial of an individual instruction when the jury has been instructed properly and fully by the granting of all the instructions. *Catchings v. State*, **684 So.2d 591, 599 (Miss.1996).** The elements of murder were sufficiently addressed by the granting of other instructions. This assignment of error is without merit.

## V. WAS IT ERROR FOR THE TRIAL COURT TO REFUSE TO GIVE A CAUTIONARY INSTRUCTION ABOUT ACCOMPLICE TESTIMONY?

In Williams's fifth assignment of error, he argues that proposed jury instruction D-14, an "accomplice cautionary instruction," should have been submitted to the jury. We disagree. The supreme court has held on numerous occasions that "the trial court has broad discretion in deciding whether to grant a cautionary instruction regarding the testimony of an accomplice; and the refusal to give such an instruction does not constitute reversal error." *Green v. State*, **456 So.2d 757, 758 (Miss.1984)**. "However, that discretion is subject to abuse when the State's evidence rests solely upon the testimony of an accomplice and there is some question as to the reasonableness and consistency of the testimony, or the defendant's guilt is not clearly proven . . ." *Id*. After review of the record, we find that the State's evidence was not wholly dependent on the testimony of Jeffery. Arnotia and Katrina's testimony as well as the testimony of the Jackson police officers corroborated the fact that Williams participated in a beating which caused the death of Mr. Cutley. We find no merit in this argument.

## VI. DOES THE EVIDENCE ADEQUATELY SUPPORT A MURDER CONVICTION?

In Williams's sixth assignment of error, he contends that taking the State's case in the best light, the evidence only supports a conviction of manslaughter. He suggests that there is no evidence that he formed, nor premeditated, an intent to kill. We disagree. Arnotia's, Katrina's and Jeffery's testimony support his conviction of murder. Each one of these eyewitnesses stated that Williams either kicked, hit, or stomped Mr. Cutley, causing his death. "The proof of the severe and intensive nature of the beating, [the death that resulted], together with the statements of [the eyewitnesses] made a jury issue relative to whether [Williams] intended to kill [Mr. Cutley]. *Pulliam v. State,* **298 So.2d 711, 713 (Miss.1974).** This assignment of error is, too, without merit.

## VII. WHETHER THE SENTENCE OF THE APPELLANT WAS UNCONSTITUTIONALLY

**DISPROPORTIONATE TO CO-DEFENDANTS' SENTENCES?**

In Williams's seventh assignment of error, he compares the sentences of his accomplices to his sentence of life imprisonment. Five accomplices pled guilty to manslaughter and received twenty year sentences. Jeffery pled guilty to manslaughter and received a fifteen year sentence with five years suspended. Carla went to trial and was convicted of murder. She received a twenty-eight year sentence. Williams contends that his sentence is disproportionate to the other sentences. The imposition of sentence is within the sound discretion of the trial court and this Court will not reverse the sentence so imposed, if it is within the limits of the statute. *Reynolds v. State*, **585 So.2d 753, 756 (Miss.1991).** Williams's sentence of life imprisonment falls within the statutory requirement of Miss. Code Ann. § 97-3-19 (Rev.1994); therefore, we find that the trial judge did not abuse his discretion.

**VIII. WAS THE JURY PROPERLY INSTRUCTED ON REASONABLE DOUBT?**

In Williams's eighth assignment of error, he argues that Instruction D-4 should have been allowed because it explained to the jury the manner in which the jurors would apply the reasonable doubt standard to the evidence. We find that although Instruction D-4 was an acceptable instruction, *Conner v. State*, **632 So.2d 1239, 1257 (Miss.1993),** we again state that we will not reverse for denial of an individual instruction when the jury has been instructed properly and fully by the granting of all the instructions. *Catchings,* **684 So.2d at 599.**

Instruction D-4, which was refused, reads as follows:

> Reasonable doubt may arise from the whole of the evidence, the conflict of the evidence, the lack of evidence or the insufficiency of the evidence; but however it arises, if it arises, it is your sworn duty to find the Defendant "Not Guilty".

Accepted Instructions D-3, D-6, and D-8, respectively, read as follows:

> *Instruction D-3*
>
> You are bound in deliberating upon this case to give Don Williams the benefit of any reasonable doubt of his guilt that may arise out of the evidence in this case. Mere probability of guilt, however strong, will never warrant you in convicting him. It is only when on the whole evidence that you are able to say, on your oath, that Don Williams is guilty beyond a reasonable doubt, that the law permits you to find him guilty; until then, it remains your sworn duty to return a verdict of "Not Guilty.

> *Instruction D-6*
>
> The presumption of innocence places upon the State the burden of proving Don Williams guilty of each and every material element of the crime with which he is charged, beyond a reasonable doubt. The presumption of innocence attends Don Williams throughout the trial and prevails at its close unless overcome by evidence which satisfies the Jury of his guilt beyond a reasonable doubt. Don Williams is not required to prove his innocence.

*Instruction D-8*

> One of the issues in this case is the identification of the defendant as one of the persons who allegedly committed the crime. The prosecution has the burden of proving identity, beyond a reasonable doubt of the accuracy of the identification of Don Williams before you find him guilty. You must consider the credibility of each identification witness in the same way as any other witness. If after considering the testimony, you have a reasonable doubt as to the accuracy of the identification, you must find the Defendant, not guilty.

Considering the aforementioned instructions that were submitted to the jury, we find that the jurors were properly instructed on the manner of applying the reasonable doubt standard to the evidence. We find no merit in Williams' eight assignment of error.

## IX. DID THE TRIAL COURT ERR IN NOT GIVING A SIMPLE ASSAULT INSTRUCTION?

In Williams's ninth and final assignment of error, he contends that the trial judge erred in denying Instruction D-12, a simple assault instruction. We disagree. "It is well settled in this state that before a lesser-included offense instruction is given it must be warranted by the evidence." *Stevens v. State*, **458 So.2d 726, 731 (Miss.1984);** *see also Johnson v. State*, **416 So.2d 383 (Miss.1982);** *Spencer v. State*, **348 So.2d 1030 (Miss.1977);** *Murphy v. State*, **226 So.2d 755 (Miss.1969).** We find that an evidentiary basis does not exist in this case to support a simple assault instruction.

"A person is guilty of simple assault if he (a) attempts to cause or purposely, knowingly, or recklessly causes bodily injury to another; or (b) negligently causes bodily injury to another with a deadly weapon or other means likely to produce death or serious bodily harm." **Miss. Code Ann. § 97-3-7(1) (Rev.1994)**. The facts of this case point only to purposeful, knowing or reckless behavior which caused *serious bodily injury*, rather than *mere bodily injury* as required by the definition of simple assault in subsection (a). Mr. Cutley died as a result of blunt blows to the head. His death elevated the criminal charge to murder. Williams' participation in the constant beating which caused Mr. Cutley's death ruled out negligence as required by the definition of simple assault in subsection (b). The jury could not have rationally found Williams guilty of simple assault, rather than murder. Finding no error in the case *sub judice*, we affirm the circuit court's judgment.

**THE JUDGMENT OF THE HINDS COUNTY CIRCUIT COURT OF CONVICTION OF MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO HINDS COUNTY.**

**BRIDGES, C.J., McMILLIN AND THOMAS, P.JJ., COLEMAN, DIAZ, HERRING, HINKEBEIN, PAYNE, AND SOUTHWICK, JJ., CONCUR.**